UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

JACK MANN,
Plaintiff,

4:15-cv-1440

v.

FILED
SCRANTON
JUL 27 2015
PER DEPUTY CLERK

HEATHER BALES: JUDSON MANN: GEORGE F. MANN III: JULIA A. MANN: G.F. MANN AGENCY, LTD.: MANN INSURANCE AGENCY, INC.: GLOBAL RISK SERVICES, LTD.: ALL BOARD OF DIRECTOR MEMBERS OF EACH CORPORATION,
Defendants.

CIVIL COMPLAINT AT LAW

NOW COMES, Jack Mann, (hereinafter 'Mann'), pro-se, with the above named COMPLAINT, and in support thereof, states as follows:

1. Heather Bales, formerly Heather Mann, acquired a corporation named Mann Insurance Agency, Inc. through a divorce with Mann.

2. At no point did the divorce decree, or any other language within same state that Heather Bales (nee Mann)(hereinafter 'Bales') was to receive the asset known as Mann's Book of Business (hereinafter 'BOB').

3. Bales, upon information and belief, sold the corporation known as Mann Insurance Agency, Inc. (hereinafter 'MIA') to Judson Mann, (hereinafter 'Judson'), George F. Mann, III, (hereinafter 'G3'), Julia A. Mann, (herinafter 'JAM'), G.F. Mann Agency, Ltd. (hereinafter 'GF Mann'), and Global Risk Services, Ltd., (hereinafter 'GRS').

4. This transaction is improper as it was inclusive of the BOB owned by Mann, which, clearly was not an asset of Bales or MIA. Conversion is not proper under this circumstance.

5. Judson, G3, JAM, GF Mann, and GRS all knew or should have known that a BOB is not the property of the corporation that was selling

the same BOB.

COUNT I. CONVERSION

6. 1-5 are restated here.

7. Under Illinois law, the elements of converstion are: (1) the plaintiff's right in the property; (2) the plaintiff's right to the immediate, absolute, and unconditional possession of the property; (3) the defendant's unauthorized and wrongful assumption of control, dominion, or ownership over the property; and (4) a demand by the plaintiff for possession of the property. DirecTV, Inc. v. Patel, 2003 U.S. Dist. LEXIS 25376, 2003 WL 22682443, *1 (N.D. Ill. Nov. 12, 2003; Nelson v. Sotheby's Inc., 115 F. Supp. 2d 925, 929 n.2 (N.D. Ill. 2000).

8. Mann had and has a right to his property. Mann had an agreement contained within the MIA computer system, scanned into the system, which stated that this BOB was owned by Mann, and was temporarily 'housed' within MIA. Any deletion of the Agency Manager For Windows documents throught their online service could only have been done before, during, or after this illegal conversion of Mann's BOB by MIA, GF Mann, GRS, Judson, Bales, G3, or JAM.

9. Mann's right to the property is immediate, absolute and unconditional possession of the property. Within the agreement between MIA and GF Mann in 2008, attorney Edwin Josephson, Chuhak & Tecson even had the BOB defined as **JACK MANN'S BOOK OF BUSINESS**. This was never defined as being owned by any entity other than the individual, Jack Mann. This right to the property is immediate, absolute, and unconditional possession of the property is to be remedied.

10. Mann never signed a waiver of his rights to the BOB in any agreement, at any time.

11. There is no Election Form-Release Form or other form which

provides Bales any rights to Mann's BOB.

12. Judson, G3, JAM, GF Mann, GRS, Bales, and MIA all are party to intentional interference with prospective economic advantage.

COUNT II. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

13. 1-12 are restated here.

14. To establish a claim for intentional interference with prospective economic advantage in Illinois, a plaintiff must allege: (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy ; (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy; and (4) damages to the plaintiff resulting from the defendant's interference. Mann had a reasonable expectancy of entering into a valid business relationship with Bales. Upon incarceration, Mann and Bales spoke multiple times about the commission from the MIA being used to pay expenses, and after all were paid (fixed, variable) Mann was to receive 50% of any and all money left over. This was never done as Bales refused to properly compensate Mann at any time after his incarceration in January, 2010. Bales was aware of the expectancy by Mann at all times. Bales intentionally, and without justification interfered which caused the breach or termination of Mann's expectancy that this would allow for a financial benefit to Mann when Mann was told by his children, on a phone call from a federal prison, that their Mother, Bales, sold MIA to Judson, G3, JAM, GF Mann, GRS. Mann asked if the sale was including the clients, to which Mann's child answered 'Yes.' This call occurred on or about April of 2014. Mann has damages in excess of $499,999 due to the defendants interference.

15. In Illinois, the element of cantractual intent, generally a question of fact, may nonetheless be established as a matter of law when the material facts are not disputed. Mann and Bales went through a divorce. During this divorce, Bales took almost everything Mann had up to this point in his life, and the list is so long that he will not waste this Honorable Court's time with the absolutely petty and ridiculous itesm that Bales believes to be hers. Mann simply needs to show that the contract between himself and MIA was in existence, it was scanned into the Applied Systems Agency Manager online product, which may have been manipulated by Bales, Judson, G3, JAM, or another employee of any of the aforementioned. During the divorce decree there is no mention of a BOB, and therefore, that silence is showing, with facts and evidence, that the BOB was not included within the divorce.

16. Silence to the BOB is an issue that clearly depicts this BOB as an asset of Mann's which was not included within the divorce, or the divorce decree.

17. The elements of this Count II are met, hereby showing that all defendants acted in a manner so as to deprive Mann economic advantage.

COUNT III. BREACH OF CONTRACT

18. 1-17 are restated here.

19. The elements of breach of contract are: (1) the existence of a valid and envorceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff. In this case at bar, there is an existence of a valid and enforceable contract, which was contained within the

computer software used by MIA, known as Applied Systems Agency Manager for Windows. This is a software used by both GF Mann, and more likely than not, Global Risk Services, Ltd. as well. The documents that were scanned and stored within the software online with Applied Systems (hereinafter 'TAM'), which outlined the agreement between Mann and MIA. Bales was and is aware of this agreement, and the agreement was transferred from MIA software to GF Mann software and/or GRS software. There can be no denying that this contract existed, was and is valid, and is enforceable. Performance was completed by Mann by allowing his BOB to be housed at MIA to allow MIA to receive commissions for the ongoing residual commissions from Mann's sales came in to MIA. The corresponding income, after fixed and variable expenses was to be split 50/50 between Mann and MIA, as per the contractual agreement. Mann's portion of ther performance is met. Defendant did not, has not, and has never alluded to pay Mann the fifty percent of the agreement reached amount of the profit after all expenses, thus a breach of contract by Bales. This breach extends to the owners of GF Mann, GRS, and any other entity that these other individual defendants own. Resultant injury to Mann is the sale price of his BOB, the loss of the 50% income over SIX years of his share of the profits (50%), as well as the loss of use of money during that period of time. This resultant injury also extends to the companies or company that MIA was sold to, which wrongly included the BOB, which as it turns out, the owners of an insurance agency in the State of Illinois would already know that the salesman would retain ownership of the BOB. For them to act now as if this

is unheard of is laughable. G3 alone was sued by GF Mann in 1998, and entered into a MUTUAL RELEASE AND SETTLEMENT AGREEMENT whereby G3 was allowed to take specific portions of his BOB, and would not be sued for imbezzlement of @ $2,200,000 (two million two hundred thousand dollars) if he (G3) returned his stock in GF Mann (10%). G3, and Judson are intimately aware of the ownership of a salesman's own BOB.

In fact, Judson and Mann entered into a similar agreement with Dirk Glass at GF Mann in the Nineties, when they were located at 1444 N. Farnsworth Avenue, Aurora, IL. Again, there can be no denying that this type of arrangement is very well known and practiced constantly in the industry.

Liability in this instance is either Bales's, MIA, Judson's, GF Mann, G3's, GRS, or a combination of all of the above, including JAM in some ancillary capacity as well.

## COUNT IV. UNJUST ENRICHMENT

20. 1-29 are restated here.

21. Mann must establish that defendants met the elements of Unjust Enrichment in that the defendants: (1) received a benefit, (2) to plaintiff's detriment, and (3) defendant's retention of the benefit would be unjust. TRW Title Insurance Co. v. Security Union Title Insurance Co., 153 F.3d 822, 828 (7th Cir. 1998)(citing HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 131 Ill. 2d 145, 160, 545 N.E. 2d 672, 679, 137 Ill. Dec. 19 (1989)). Mann is certain that an amount of money was agreed upon for the said BOB (which is the entire value of MIA minus some filing expenses and fixed assets), and that amount of money is being paid or has been paid

to Bales. GF Mann, GRS, G3, Judson, and JAM all are benefitting from the sale of Mann's BOB, hence Unjust Enrichment from an illegal or improper conversion of Mann's BOB.

22. The implied contract between both Mann and MIA was such that if MIA wished to purchase Mann's BOB, MIA would pay 1.5 times the total annual commissions generating from Mann's BOB in a 12 month period from the date of the sale. The terms of this were always implied.

23. When a specific contract governs parties' relationships, the doctrine of unjust enrichment, which is based on an implied contract, does not apply. People ex rel. Hartigan v. E & E Hauling, Inc., 153 Ill.2d 473, 497, 607 N.E. 2d 165, 177, 180 Ill. Dec. 271 (Ill. 1992)(citing La Throp v. Bell Federal Savings & Loan Association, 68 Ill. 2d 375, 391, 370 N.E. 2d 188, 12 Ill. Dec. 565 (Ill. 1977)(other citations omitted)).

24. Mann states here that unjust enrichment is a valid claim as there were no specific items within the contract itself, as it did not spell out a 'iron clad' purchase price for the BOB.

25. The contract itself did not govern the relationship, only that the BOB be housed at MIA.

26. This unjust enrichment claim is based squarely upon the tortious conduct by defendants herein. Liberty Mut. Ins. Co. V. Decking and Steel, Inc., 301 F. Supp. 2d 830, 835 (N.D. Ill. 2004)(citing Peddinghaus v. Peddinghaus, 295 Ill. App. 3d 943, 949, 692 N.E. 2d 1221, 1225, 230 Ill. Dec. 55 (1st Dist. 1998)(denying summary judgment on unjust enrichment claim despite contract between parties because the unjust enrichment sounded in tort rather than quasi contract). In Peddinghaus, the court reversed the dismissal of the plaintiff's unjust enrichment

claim because it could properly survive based on allegations that the defendants fraudulently induced plaintiff to sell shares in a trust. 295 Ill. App. 3d at 949, 692 N.E. 2d at 1225. Mann states that G3 is no stranger to illegal maneuvers to get what he wants, as noted in the 1998 suit, G.F. Mann Agency, Ltd. v. Global Risk Services, Ltd.; George F. Mann III, in DuPage County, Illinois. G3, Judson, Bales all acted in concert to defraud Mann of his rightful enrichment. Because Mann is in federal prison, the crew believes that there is no recourse at all...and they went ahead and did the deal, behind closed doors, without a word to Mann. Mann had to find out about this underhanded tortious deal through his own child, a minor at the time. Not so shocking is the tortious acts by G3 and Judson. Both have had their share of issues with white collar crimes, however, none that have landed them in federal or state prison, yet. Bales, it is believed, was induced into this deal, however just as culpable for her willingness to partake in it and defraud Mann out of enrichment. Amazingly, greed is a strange thing in that will do many horrible things to many people -- why just look at Mann in a federal prison over greed!

27. Mann has sufficiently alleged and shown the elements necessary to show unjust enrichment -- the only thing missing is the sale contract between defendants, and the price they arrived at.

## COUNT V. REPLEVIN

28. 1-27 restated here.

29. Mann shows that there is an entitlement to enrichment by Mann. Mann proves that his entitlement to the BOB sale proceeds, loss of use of money, and 50% of profit for the six years he has been

incarcerated are the reult of defendants' wrongful taking and retention of his BOB.

30. The wrongful taking of property extends to bona fide purchasers for value, without any knowledge of the prior fraudulent act. Thus, even an innocent purchaser for value can be liable for conversion. In this case, none ot the individuals are "innocent." Bales is Mann's ex-wife, and extremely bitter about Mann going to prison. G3 is Mann's biological brother who attempted to and successfully embezzled approximately $2,200,000 from GF Mann Agency, Ltd. when Mann and Judson were shareholders in the entity. This resulted in G3 being sued by GF Mann, signed off on by G3's deceased Father, George F. Mann, Jr. and Mann. Judson, who Mann was partners with in GF Mann prior to Mann's buyout of his BOB using Edwin Josephson of Chuhak & Tecson for the closing. Mann left GF Mann and Judson due to Mann being told by a tennant of Judsona nd Mann's at a commercial property they owned together (KVB Partners, LLC.) named Tony Lazarda. According to Lazarda, G3 and Judson were working on the computers on weekends when Mann was not there, spending hours printing off reports from the agency software, TAM. Upon learning of this breach of a verbal agreement between Mann and Judson, that if anyone was within arms reach of G3, they could not be trusted. Judson made a decision to go against this verbal agreement between Mann and Judson. Of course, Mann has learned from the U.S. Probation Office, that Judson has rewritten history; Zackary Freeze has information in Mann's Presentence Investigation Report whereby Judson claims that the reason that G3 left GF Mann was because of their parents 'enabling' of Mann. Judson and G3 seem to forget that G3 embezzled

money, was sued for that money, and entered into a Mutual Release and Settlement Agreement with GF Mann. They also seem to forget that G3 did, in fact, breach his fiduciary responsibility to a corporation that he owned stock in. By stealing business away from a business that he owned stock in, G3 was showing a willingness for Fiduciary Breach as well. They also seem to forget that G3 did not attend his own Mother's wake or funeral. All of these things may seem blooded or vindictive for Mann to bring up, however, this is the only way that it will all come out in the open, and everyone gets to "open their kimono" so there is a level playing field.

G3 and Judson are both interested in rewriting history to claim that Mann is the root of all evil because he is in prison. Mann is in prison for SOLICITATION OF MURDER (18 USC § 373). Mann was involved in a scam that got caught up in a sting. Mann was attempting to rip off two men who wanted things from the other. In this double-cross rip-off, Mann attempted to steal seven kilos of cocaine from Frank Caira (Caira wanted a DEA Agent and an AUSA of the N.D. of Ill murdered), and steal $75,000 from Ricardo Ruiz (Confidential Informant for the FBI, Paid informant in the Latin King RICO case). Each wanted the other to compelte a task ( Caira wanted 2 murders done by Ruiz / Ruiz wanted to learn how to manufacture MDMA and Cocaine Hydrochloride ). Mann was the middle man who was going to rip them both off and purchase an insurance agency in Sterling, Illinois, and live happily ever after...but that was not to be. Mann is no angel, he did commit his crime. Mann never said he did not commit it, and that is why Mann is in prison doing time (105 months). Rewriting history is not something Mann is fond

BOB statements and commission statements. Bales never provided that. Bales was and is aware of the contract. Bales intentionally interfered by selling Mann's BOB to a 3rd party, which happens to be Mann's two (2) brothers, who incidentally were in litigation against each other (technically) in the 1998 suit GF Mann v. George F. Mann III and Global Risk Services. This was kept from Mann, and only came to Mann's attention on or about April, 2014. This was a breach of contract caused by Bales acts to sell the BOB without any knowledge given to Mann. Mann has damages. These damages are extensive, and it will be expensive for all parties to get out of this suit.

36. Mann is not in charge of explaining to a divorce attorney that the divorce decree does not include a provision for Mann's BOB. In her acts, errors, omissions, intentional torts, or unintentional torts, Bales's divorce attorney overlooked a very large issue. Ownership in Mann's BOB was, and still is Mann.

37. Mann has shown the existence of a fiduciary duty, a /breach of that duty, and an injury as a result of that breach. The existence of the duty was clear -- Bales was handling all of the business dealings with MIA during Mann's (and throughout) Mann's incarceration. The breach is failure to provide Mann with any reports regarding his Book of Business, Commission Statements, Fee Revenues, Expenses, and ultimate profit from the monthly amounts. Expenses were to include due consideration for care of the children.

38. Defendants Judson, G3, JAM, GF Mann, GRS, and any other possible employees in any of these companies or any other companies owned by any of the aforementioned were all aware of the existence of

a contract between Mann and Bales. They were just hoping that by Mann being in prison, there would be no repercussions of any kind.That means there was a contract and all of the defendants' knew of its existence. All of the defendants' intentionally interfered with the contract by causing Bales to breach the contract. There is absolutely no justifiable reason for the interference other than they all felt like committing fraud upon Mann. Damages to Mann exceed $499,000 easily. In fact, a 50% profit earnings of six years plus the price of the book of business (BOB) would be even more than that amount.

COUNT VIII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

39. 1-38 are restated here.

40. A Claim for intentional infliction of emotional distress has four elements: (1) the defendant behaved as he did for the purpose of causing emotional distress; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was a cause-in-fact of the plaintiff's injury; and (4) the plaintiff suffered an extreme disabling emotional response to the defendant's conduct. Alsteen v. Gehi, 21 Wis. 2d 349, 359-61, 124 N.W. 2d 312, 318 (1963).

41. All defendants' committed these acts for the purpose of causing Mann to become completely indigent, thus knowing that being indigent would cause emotional distress -- and this proves their acts were intentional and with purpose to cause Mann emotional distress. The defednants' acts of stripping away the one single source of income for Mann while he is in prison, unable to defend himself (as he is indigent due to their acts) is clearly an extreme act, and outrageous. Defendants' conduct was a cause-in-fact of Mann's injury. After hearing of the horrible acts of the Defendants',

COUNT VI. BREACH OF FIDUCIARY DUTY

31. 1-30 are restated here.

32. A plaintiff cannot obtain federal jurisdiction by simply alleging a federal common law question, there must be substantive, thoughtful questions that necessitate the distrtict court's attention. In determing whether a deb is for money obtained by fraud, courts may look beyond the terms of a settlement agreement or consent decree and examine the underlying substantive claims.

33. In order to state a claim of Breach of Fiduciary Duty, Mann must first establish both the existence of a contract with a defendant and that the defendant breached this contract.

33. Bales had a fiduciary duty to Mann, and breached that duty when she did not send Mann the 50% of commissions and the monthly reporting of the book of business reports.

COUNT VII. TORTIOUS INTERFERENCE WITH A CONTRACT

34. 1-33 are restated here.

35. In order to state a claim in Illinois for tortious interference with a contract, a plaintiff must allege the following: (1) the existence of a valid and enforceable contract between plaintiffs and another; (2) the defendant's awareness of the contract; (3) an intentional interference by the defendant inducing breach of contract; (4) a breach of contract caused by the defendant's acts; and (5) damages to the plaintiff.

There is / was a contract between Mann and Bales. This contract is enforceable, and valid. Bales had intimate knowledge of the contract, even B.O.P. recordings will show that Bales was asked multiple times to send Mann his commissions, or the copies of the

Mann's emotional state has still not recovered. Disabling the way in which Mann believed a family dynamic was supposed to structure, and being failed of any family assistance (family of origin; Judson, G3) or contact during incarceration has caused Mann a furtherance of the emotionally disabling response to no longer wish much contact with family at all. In fact, due to these acts, Mann is totally incapable of having any semblance of a relationship with any of the members of his family of origin. It has been proven through the last six years of incarceration that Mann has, in fact, been used as a sacrificial scapegoat.

42. To recover damages for intentional infliction of emotional distress, a plaintiff must allege conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. To deprive a federal prisoner the only asset he owns in the free world to derive income is outrageous, and to do so with absolutely no regard for that same individual's property is extreme. This goes beyond all possible bounds of decency and could be regarded as atrocious and utterly intolerable in a civilized society. A jury could find in Plaintiff's favor on this count.

44. A prosecution in a criminal case is taken as the 'authority' in charge of a proceeding. Certainly a judge is the deciding factor, but a government prosecutor is the employee of the U.S. Government who is believed to be beyond any acts of malice, hatred, or bad faith. "...defendants step into criminal proceedings with trepidation with good reason. Defendants are often treated as <u>less than human</u>

and disposable. Victims are at times treated as invisible or a nuisance. Learning how to better respond to those in pain in criminal proceedings may be one of the most effective ways to address the seemingly unending cycles of violence. After all, both prosecutors and defense attorneys care deeply about the safety and well-being of our families and communities.

When trauma occurs, those impacted try to give meaning to the events and sometimes unconsciously adopt the familiar narrative of "good versus evil." Especially in a "hyper-alert climate," "a sense of 'us v. them' develops or deepens. ...Projecting evil out onto the other shifts attention away from the 'good' side's own shortcomings, their contribution to the conflict, and their own dysfunctions or internal societal ills. In essence, the 'other' becomes the sacrificial scapegoat." 96 Crim.L.Rep.(BNA) 340::, December 24, 2014, Opinion. "Malignang leaders" can escalate anxiety and fear in the community by engaging in name-calling, dehumanizing by using us/them and good/evil narratives, magnifying danger and manipulating by witholding, distorting or misrepresenting facts.

Litigating in the adversarial system, even while following codes of ethics and relevant rules and procedures, can cause harm and exacerbate pain and suffering unnecessarily. This certainly impacts victims and defendants, but it also affects attorneys, jurors, judges and the community. ..." Id.

45. There can be no doubt that as Mann was going through the process of litigation in criminal federal court (219 S. Dearborn) none of his own family of origin assisted him at all. Not even a letter of encouragement during the pre-trial phase. That aside...the

societal ills infected every area of Mann's auxillary orbitofrontal cortex. In fact, the narrative of his case was then used by Bales to attempt (and succeed) keeping his children from him; used by Judson to slander his name to former clients (BOB); used by G3 to slander his name to future clients, former clients, and any one he could come into contact with -- G3 was making up lost ground through his own theft of $2,200,000 from his father's company.

46. Converting Mann into a scapegoat is the only way that these defendants' can rationalize and internalize their justification. All of that rationalization and internalization will be lost on a jury who could find in Mann's favor that the defendants' ongoing justification of these torts is to award Mann a hefty sum of U.S. American Dollars.

## COUNT IX. DEFAMATION CLAIM

47. 1-46 are restated here.

48. Defendants' have consistently defamed Mann to former clients of Mann's, existing clients of Mann's BOB, and future clients of Mann's through a letter writing campaign that will be proven throughout the discovery phase of this litigation.

49. Marketing letters were sent out to clients making wild accusations about Mann and his ability to properly provide adequate service to customers prior to incarceration. These statements also included a defamatory set of statements about Mann's willingness to charge fees for business written in the various areas of expertise of Mann's.

50. These marketing letters were sent out by G3, Judson, GRS, GF Mann, possibly MIA, and possibly by Bales.

51. There can be no doublt that these defamatory statements harmed

Mann, continue to harm Mann, and will harm Mann in an ongoing fashion long after his release from prison. A reaonable jury could find in Mann's favor that there is ample evidence of Defamation, and award him a hefty sum.

52. To defame Mann through a letter writing or e mail blast campaign was the medium of choice for G3, Judson, GF Mann, GRS, MIA, and Bales. Through a thorough investigation of all of these parties use of; constant contact, outlook, TAM, and other outlets of social media (facebook, spoke.com, twitter, blogspot, etc.) it will be shown that the defamation by the defendants' extends way beyond the boundaries of their 'letter writing campaigns.' A reasonable jury could find that this was outrageous and extreme, and assisted in causing Mann further damages in his attempts to gain control of the absolute emotional response to the defendants' intentional infliction of emotional distress.

53. While the defendants truly believe (or have made themselves believe) they are 'right' or 'good' and that Mann is 'wrong' or 'evil' the messages will be very clear. There can be no further doubt when the jury, and this Honorable Court see for themselves that Mann was harmed, is being harmed, and will continue to be harmed as this defamation was submitted to multiple entities using letters, e mail, and other forms of social media communication which will cause Mann harm for many years. This must result in an additional sum of relief of $1,000,000.

54. Defendants' adopted the view that Mann is the 'evil' in the good vs. evil, and therefore justify their own shortcomings and societal ills.

COUNT X. ILLEGAL USE OF ILLINOIS STATUTORY SHORT FORM POWER OF ATTORNEY FOR PROPERTY FOR JACK T. MANN

55. Restate 1-54 here.

56. On or about April 20, 2005, Mann and Bales entered into some Estate Planning. When this was done there was a POA (EXHIBIT 1) which gave Bales the allowance to convert assets, etc. ONLY if Mann was alive while INCAPACITATED. Mann was not incapacitated, and for Bales to claim so in order to dissolve every single asset Mann had is a horrible way to defraud Mann prior to her filing for divorce, in anticipation of filing for divorce. The divorce filing began in 2010, and Bales utilized Danya Grunyk (Naperville Divorce Attorney), and Bales began negotiations with Grunyk long before making Mann aware of her intentions.

57. Bales utilized the very same form (EXHIBIT 1) to keep the proceeds from sale of Mann's vehicle, Mann's watches, Mann's artwork, and the inheritence from Mann's Mother and Father. Bales acted with such deception Mann had to file a complaint with the Secretary of State Police in Illinois. It was then that Bales gave the POA to the investigating officer. The clause that Bales has been using to justify her actions, is using to justify her actions, and will use to justify her actions is the use of the term "INCAPACITATED."

**incapacitated person.**

> any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, advaced age, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent of lacking sufficient understanding or capacity to make or communicate responsible decisions. Uniform Probate Code § 5-103(7).

If a U.S. Citizen is in a federal prison, they are not "incapacitated." Therefore, invocation of any POA was/is improper, and Bales, Judson, G3, GF Mann, GRS, JAM, and any other party involved are

now civilly liable for actions taken in collusion.

58. Contained within the POA, it states:

> THIS FORM DOES NOT IMPOSE A DUTY ON YOUR AGENT TO EXERCISE GRANTED POWERS: BUT WHEN POWERS ARE EXERCISED, YOUR AGENT WILL HAVE TO USE DUE CARE TO ACT FOR YOUR BENEFIT AND IN ACCORDANCE WITH THIS FORM AND KEEP A RECORD OF RECEIPTS, DISBURSEMENTS AND SIGNIFICANT ACTIONS TAKEN AS AGENT. A COURT CAN TAKE AWAY TRHE POWERS OF YOUR AGENT IF IT FINDS THE AGENT IS NOT ACTING PROPERLY. YOU MAY NAME SUCCESSOR AGENTS UNDER THIS FORM BUT NOT CO-AGENTS. UNLESS YOU EXPRESSLY LIMIT THE DURATION OF THIS POWER IN THE MANNER PROVIDED BELOW, UNTIL YOU REVOKE THIS POWER OR A COURT ACTING ON YOUR BEHALF TERMINATES IT, YOUR AGENT MAY EXERCISE THE POWERS GIVEN EHRE THROUGHOUT YOUR LIFETIME, EVEN AFTER YOU BECOME DISABLED.... EXHIBIT 1.

The interesting issue within (well one of many interesting issues within) this POA is the fact that Bales is/was supposed to keep records and explain significant actions taken as agent. Not one time has Bales, in the last six years contacted Mann to inform him of her willingness to take all of his belongings and sell them off as if she was running a red-neck garage sale out of her trailer park home. Quite the opposite, in fact, and Bales, Judson, G3, JAM, GF Mann, GRS, and more likely than not, James Bales (Bales' spouse) have all benefitted as a result of these capitalizations by Bales. By using a POA that is supposed to be used only if Mann is disabled or dead, essentially, Bales misinforms or lies to a Secretary of State Police (IL) Officer (Investigator Brian Sims) and shows him the divorce decree and POA, then explains to Sims how she had to sell everything for money -- that she needed money so badly that she could not go on. This is how she explained away the sale of Mann's vehicles, jewelry, inheritance, etc. Bales acted in a willful manner, which shows a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998). There is proof that the defendants intended

to cause the injury and not simply "the act itself." Id. at 61-62. The Geiger Court noted that to give the "willful and malicious" standard a broader interpretation would be to except from discharge injuries derived from "[e]very traffic accident stemming from an initial intentional act" and every "knowing breach of contract." Id. at 62. The discharge 'should be confined to those plainly expressed.'" Id.

59. Maliciousness as used in section 523(a)(6) has been defined as a "conscious disregard of one's duties without just cause or excuse; it does not require ill-will or the specific intent to do harm." In re Thirtyacre, 36 F. 3d 697, 700 (7th Cir. 1994). Failure to return the sold vehicle or the cash from it, the sold BOB and the cash from it is / was a tortious act(s).

COUNT XI. VIOLATIONS OF ILLINOIS UNIFORM FRAUDULENT TRANSFER ACT

60. (IUFTA) is the adoption of the Uniform Fraudulent Transfer Act and parallels sections of the federal code for fraud and constructive fraud (ILCS 160/5(a)(2) & ILCS 160/6(a)). Analysis of the federal and state claims of actual fraud and constructive fraud together is permissible. See Baldi v. Samuel Son & Co., Ltd., 548 F.3d 579 (7th Cir. 2008).

61. For the "actual intent" allegations under 740 ILCS 160/5(a)(1), both a statute of repose and a statute of limitations are applied by § 10(a) of the Illinois Uniform Fraudulent Transfer Act (IUFTA), 740 ILCS 150/10(a). Section 10(a) states that a cause of action under § 5(a)(1) is extinguished unless it is brought within 4 years after the transfer is made (a period of repose) or, if later, within one year after the transfer was or could reasonably have been discovered

by the claimant" (a period of limitation). See Official Comm. of Unsecured Creditors of SGK Ventures, LLC. v. Newkey Group, LLC, et al., 2014 Bankr. LEXIS 4670. Further it states,

> In contrast, for a claim under §5(a)(2), there is no statute of limitation. Section 10(b) of the IUFTA makes "constructive fraud claims subject only to the 4-year period of repose; a claimant's lack of knowledge does not extend the period before extinguishment of the claim. The effect of § 10, then, is to create a special statutory tolling system for fraudulent transfer recoveries, with a four year period of repose for transfers made with either actual or constructive fraudulent intent, and a one-year limitation period based on the claimant's discovery of the transfer that supercedes the period of repose, only for actually fraudulent transfers. Id.

Mann is within the statute of repose and a statute of limitations within the IUFTA. Mann is eligible for damages.

## COUNT XII. CONSTRUCTIVE FRAUD

62. Restate 1-61 here.

63. The elements of constructive fraud are: (1) a duty that the defendant owes to the plaintiff by virtue of their relationship; (2) violation of that duty through "the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists"; (3) reliance by the plaintiff; (4) injury to the plaintiff as a proximate result thereof; and (5) the gaining of an advantage by the defendant at the plaintiff's expense. Rice v. Strunk, 670 N.E. 2d 1280 (Ind. 1996).

Mann was owed a duty by Bales by virtue of their contractual relationship (Power of Attorney, if, in fact, this Court believes Mann was 'incapacitated') in the form of the POA and the agreement between Mann and MIA for the housing of his BOB.

Bales was deceptive as there were multiple misrepresentations of past and existing facts, as well as silence to specific issues

when a duty to speak existed.

Mann relied upon Bales to be honest and trustworthy through the terms of both of these contractual agreements.

Mann was injured as a proximate result thereof to the tune of $499,000 in actual damages, loss of income, loss of all his personal belongings as well (which may or may not be addressed in this suit). The damages are a result of a commercial contract between Mann and MIA, the breach of that contract by Bales, and the knowledge of the breach by Judson, G3, JAM, GF Mann, GRS, and any employees of any of the corporations listed.

Bales gained multiple advantages at Mann's expense. First, Bales purposefully ceased placing money on Mann's book when he was in federal custody so he could not hire a contract attorney to show where Bales had defaulted, and so he could not hire a divorce attorney to spell out better terms within the divorce decree. These were to Mann's detriment and to Bales benefit.

## COUNT XIII. ACTUAL FRAUD

64. 1-63 Restated Here.

65. The Fraudulent Transfer Act punishes two types of fraud on a creditor. The first ("actual fraud") is a transfer of assets with actual intent to hinder, delay, or defraud any creditor, 740 ILCS 160/5(a)(1). This occurred to Mann by Bales. The second ("constructive fraud") is a transfer of assets without receiving a reasonably equivalent value in exchange for the transfer for obligation, and the debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due, 740 ILCS 160/5(a)(2)(B). The subjective element ("Actual Intent")

makes the first type of fraudulent conveyance more difficult to prove.

Mann and Bales had a contract in both the agreement between MIA and Mann as well as between Mann and Bales through a POA. Within the POA, Bales sold Mann's assets knowing that Bales would incur debts beyond her ability to incur or reasonably should have believed that she would incur, debts beyond her ability to pay as they came due. Id.

A jury will be asked and insturcted that they need to decide if Bales acted deliberately or with callous indifference, evidenced by an a/ctual intent to violate plaintiff's rights or reckless disregard for his rights. Wilson v. Williams, 83 F. 3d 870 (1996).

64. Mann claims that Bales transferred property to GF Mann, Judson, G3, GRS, JAM or similar. This was done with the actual intent to hinder, delay or defraud Mann. Courts in Pennsylvania engage in a two-step analysis to determine whether a defendant is liable for actual fraud. United Ass'n v. Schmidt, CIV. A. 10-1815 (RBK/JS) 2011 U.S. Dist. LEXIS 18699, 2011 WL 766057, at *7 (D.N.J. Feb. 24, 2011). First the court must determine "whether the debtor has put some asset beyond the reach of creditors which would have been avaialble to them at some time but for the conveyance." Id. (citations omitted). Second the court must determine "whether the debtor transferred property with the intent to defraud, delay, or hinder the creditor." Id. "The party seeking to invalidate the transfer has the burden of proving actual intent to defaud, courts should balance the factors enumerated in N.J.S.A. § 25:2-26, as well as any other factors relevant to the transaction." Gilchinsky v. Nat'l Westminster Bank N.J., 159 N.J. 463, 732 A.2d 482, 289 (1999). The N.J.S.A. § 25:2-26 factors include:

> a) the transfer or obligation was to an insider; b) the debtor retained possession or control of the property transferred after the transfer; c) the transfer or obligation was disclosed or concealed; d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; e) the transfer was of substantially all the debtor's assets; f) the debtor absconded; g) the debtor removed or concealed assets; h) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; j) the transfer occurred shortly before or after a substantial debt was incurred; and k) the debtor transferred the essential assets fo the business to a lienor who transferred the assets to an insider of the debtor.

66. All of the above occurred. Bales transferred the assets of Mann to Judson, G3, JAM, GF Mann, GRS or similar which was, in fact an 'insider' of debtor (Bales). Bales assured that the assets were beyond the reach of Mann. These assets are to include the BOB and a 1963 Chevy Impala SS CONSERVATIVELY APPRAISED FOR $75,000. Bales sold this at a tremendous loss, prior to the divorce contract being contemplative of a divorce, without Mann's prior knowledge. This was breach of the POA; the sale of the BOB, Mann's sole asset, to GF Mann, GRS, Judson, G3, JAM or some other entity is also yet another transfer of assets of Mann's that were obligated to be paid to Mann. The debtor absconded with all of debtor's (Mann's) assets remaining to him in life. Interestingly, Bales seems to believe this is truly hers. Further, the transfer, while separate entities, all Defendants knew of the ownership of the BOB by Mann, and therefore are also culpable. G3, of all people, knows how these suits and contacts work when people are sued after the fact for breaching a contract...See G.F. Mann Agency, Ltd. v. George F. Mann III and Global Risk Services, Ltd., Case No. 98 CH 1170.

## COUNT XIV. BREACH OF ILLINOIS TRADE SECRETS ACT 765 ILCS 1065/1, et seq.

67. Mann restates 1-66 here.

68. At all times relevant hereto, there existed in Illinois an act known as the "Illinois Trade Secrets Act," 765 ILCS 1065/1, et seq.

69. The aforesaid conduct of Defendants constitutes violations of the Illinois Trade Secrets Act.

70. As a result of Defendants violation of the Illinois Trade Secretes Act, Mann has suffered significant damages.

## COUNT XV. VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT (815 ILCS 505/1, et seq.)

71. Mann restates 1-70 here.

72. At all times hereto, there existed in Illinois an act known as the "Consumer Fraud and Deceptive Business Practices Act," 815 ILCS 505/1, et seq.

73. Defendants, utlizing the type of correspondence that has been noted and explained in the aforementioned, are unfair statements through the web, blast e mails, etc. These are unfair, deceiving, and in violation of the "Uniform Deceptive Trade Practices Act" (815 ILCS 510/2) and is extremely likely to mislead consumers and affect trade and commerce in the State of Illinois, and across the web in all states.

74. As a result of the Defendant's violation of the Consumer Fraud and Deceptive Businesss Practices Act, Mann has suffered significant damages, and does not have an adequate remedy at law.

75. Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act and Uniform Deceptive Trade Practices Act.

COUNT XVI BREACH OF TELEPHONE CONSUMER PROTECTION ACT

76. Mann restates 1-75 here.

77. The elements of Telephone Consumer Protection Act claims alleged are (1) the defendant called a cellular telephon number; (2) using an automatic telephone dialing system; and (3) without recipient's prior express consent. See 47 U.S.C.S. § 227(b)(1)(C).

78. As a result of the Defendants Breach of the Telephone Consumer Protection Act ("TCPA"), Mann has suffered irreparable harm, will continue to suffer that irreparable harm and damages as long as this allowance of Mann's BOB to be in the Care, Custody, and Control of GF Mann, GRS, Judson, G3, JAM, and/or Bales, MIA, or any other firm or corporation owned or partially owned by any of the above or their families.

78. Mann is willing to potentially arbitrate this point with the Defendants, however, the other counts are not open for this same aarbitration:

> The Federal Arbitration Act ("FAA") provides that an arbitration agreement in a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a suit is brought upon an issue that the parties have agreed to arbitrate, the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Further the Court shall order arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. §4. The FAA creates "a liberal federal policy favoring arbitration agreements" and "requires courts to enforce agreements to arbitrate according to their terms." CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 669, 181 L. Ed. 2d 586 (2012). "That is the case even when the claims at issue are federal statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" Id. (quoting Shearson/American Express Inc. v. McMahon, 482 U.S. 220, 226, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987)).

79. In determining if Mann's claims under this ground are arbitrable this Honorable Court is prohibited from reviewing the merits of the dispute and must instad constrain its inquiry to "(1) whether a valid agreement to arbitrate exists and (2) whehter the scope of the parties' dispute falls within that agreement." Tickanen v. Harris & Harris, Ltd., 461 F.Supp. 2d 863, 866 (E.D. Wis. 2006).

80. Mann argues that both exist. The most intimate contracts rule requires that the Court "consider all acts of the parties touching the transaction the law of that state with which the facts are in more intimate contact." Schaffert by Schaffert v. Jackson Nat'l Life Ins. Co., 687 N.E. 2d 230, 232 (Ind. Ct. App. 1997)(quoting W.H. Barber Co. v. Hughes, 223 Ind. 570, 63 N.E.2d 417, 423 (Ind. 1945)). Factors to be considered include "(1) the palce of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." Id.

The contract clearly stated that Mann owned the BOB, and that it was 'housed' at MIA with a 50/50% split on profits monthly (commission minus expenses divided by 2), leaving Mann with enough of an income from his BOB to save some income up prior to his release from prison. Bales never paid Mann any of the said monies, never sent Mann an income statement, balance sheet, commission statement, or any other document that would show what Mann did, in fact, have coming to him by way of the 50/50% split. Any and all credit card receipts and any other fixed /variable expenses were to be sent to Mann as well. This never occurred, and within the agreement there was

a sentence about when the two parties fail to agree, they may enter into arbitration, mediation or other binding or non binding third party mediation, or binding third party mediation -- to be decided by the two parties.

GROUND XVI. ILLEGAL USE OF POWER OF ATTORNEY FROM MANN AND BALES'S ESTATE PLAN AND THE TERM OF "INCAPACITATED PERSON" BY BALES FOR HER OWN GREED

80. Mann restates 1-79 here.

81. The definition of an 'incapacitated person' is as follows:

> incapacitated person
>
> any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent of lacking sufficient understanding or capacity to make or communicate responsible decisions. Uniform Probate Code § 5-103(7).

At no time since 1/10/2010 has Mann been 'incapacitated' in any way. Mann, a U.S. Citizen, in in a federal prison. Mann can send/receive mail, e mail, and have visits with family members (even a former spouse). This is hardly an "incapacitated person" as defined by the Federal Government. Any invocation of any POA was/is improper. Bales, Judson, G3, JAM, GF Mann, GRS, MIA, and any other entity or person involved with the fraudulent conveyance of Mann's BOB is culpable/are culpable.

82. The Defendants' are now civilly liable for their actions which occurred as the result of collusion, and / or conspiracy. Mann has been harmed and suffered damages, still suffers damages, and will continue to suffer damages until he is provide the proper sale price of his BOB.

COUNT XVII. FRAUDULENT CONVEYANCE

83. 1-82 are restated here.

84. In Illinois, the elements of Fraudulent Conveyance are:

> What constitutes "reasonably equivalent value" for purposes of the Illinois Uniform Fraudulent Transfer Act *UFTA) has not been defined by Illinois case law. However, under Illinois law, one of the necessary elements to establish a fraudulent conveyance is that there must be a transfer made for no or inadequate consideration. In determining whether reasonably equivalent value was received under the UFTA, courts should consider how that phrase has been construed under the Bankruptcy Code. Citing Grochocinski v. Knippen (In re Knippen), 355 B.R. 710, 2006.

This tells us that IF Bales took less money that is the "normal, usual and customary" sale price of a insurance agency book of business, **THEN**, the transfer was made for **INADEQUATE CONSIDERATION**.

Certainly, the Defendant's will attempt to state that they were certain that the sale price was "usual and customary" when the sale was made. Before we are all caught up in a web of deceipt, the usual sale price of an insurance agency book of business is 1.5 times total annual commission of that agency's book of business. Interstingly, and Mann feels he needs to point this out as many times as humanly possible, the BOB was HIS. Selling something that is not YOURS is ILLEGAL. The best part of this entire story is...the Defendants believed they would get away with all of it because Mann is a federal prisoner, and he could never see this far. The Who, in a hit from the 1970's says, "The Eifel Tower and the Taj Mahal, I can see on clear days, I can see for miles and miles." Pete Townsend.

85. In order for a Plaintiff to establish that a conveyance is fraudulent in law under the Illinois Uniform Fraudulent Transfer Act, 740 Ill. Comp. Stat. 160/1 et seq., four elements must be present: (1) the defendants made voluntary transfers; (2) at the time of the transfers, the defendants had incurred obligations elsewhere; (3) the defendants made the transfers without recieving a reaonably equivalent value in exchange for the transfers; and (4) after the transfers, the defendants failed to retain sufficient property to pay their indebtedness. Grochocinski v Ziegler, 320 B.R. 362, 2005.

86. Bales did make a voluntary transfer of Mann's BOB.

87. Bales, had incurred obligations to Mann, and knew of these obligations at the time of the transfer. This way it would make it hard for Mann to "follow the ball" on his BOB.

88. Defendants made the transfers without receiving the "usual and customary 1.5 times the value for the book-of-business.

89. After the transfers, Bales and all other defendants fail to retain sufficient property to pay their indebtedness to Mann, at least not held in a special account for "Payment To Jack Mann." Certainly not. The Defendants thought that because Mann is a U.S. Prisoner being held captive in a federal FCI in White Deer, PA he would never be able to file anything.

90. When it is asserted that a conveyance was made with actual intent to hinder, delay, or defraud creditors, a showing of insolvency is not necessary in order for hte conveyance to be set aside. Springel v. Prosser (In re Innovative Commun. Corp.), 2011 Bankr. LEXIS 3040, August 5, 2011. There is no need to show insolvency of MIA, GF Mann, GRS, or any of the individual named Defendants in order to set aside the conveyance. Therefore, the BOB would need to be held up, in a trust, overseen by a 3rd party to assure that the business is not being moved about without any regard for what the agency "servicing the account" does with the business. In fact, the "service" could continue to be with the agency that "houses" the BOB pending a negotiation of the BOB with Mann, and a Fair Market lump sum payment by all Defendants for Mann's loss of income during the six (6) years he has been without any income from same BOB.

90. Because of the underhanded way in which G3 handled the theft, embezzlement, or fraud he generated in 1996, 1997, and 1998 to abscond with @ 2.2 million dollars, Mann will not be satisfied with just leaving the BOB with a company G3 has any ownership of. The BOB will have to have weekly oversight of the list of clients, the status of each client (independently verified by the actual insurance carriers), and the total annual premium and commission on each policy for each client. Certainly this is going to be a lot of work, and Mann can do that work from prison, however he will require a Court ORDER directing the BOP to allow these calls weekly to the insurance company contacts to eliminate all doubt.

Had it not been for the rewriting of history by both Judson and G3, Mann would not feel compelled to watch over them as if they were vultures attempting to pick his bones clean, however, they have left Mann little choice. The statements made to U.S. Probation Officer Zackary Freeze by Judson, the ongoing deliberate indifference by all Defendants to Mann's BOB and Mann's income to be derived from same is enough to assure Mann be given safeguards to keep the true evil away from any income that is rightfully Mann's.

WHEREFORE, Plaintiff Jack Mann prays that this Honorable Federal Court will GRANT Mann the following relief:

A. GRANT Mann $499,000 in loss of actual damages for Count 1, and also for this Count, $50,000 a year for six years totalling an additional $300,000 which is a total of $799,000 to be awarded to Mann for their acts in Count 1;

B. GRANT Mann $499,000 in actual damages and $300,000 for loss of income for Count 2, totalling $799,000;

C. GRANT Mann $499,000 in actual damages from Defendants, $300,000 in loss of income from Defendants, AND an additional $75,000 from Bales for her breach of a contract by stealing Mann's 1963 Chevy Impala SS, selling it, after lying to Mann that she would not, and did not sell it totallying $799,000 for Defendants and $75,000 from Bales alone for Count 3, Breach Of Contract;

D. GRANT Mann $499,000 in actual damages, $300,000 in loss of income during the six years he has been in prison, AND an additional $75,000 from Bales for her Unjust Enrichment, the total for Defendants would be $799,000 for Count 4 Unjust Enrichment, and an additional $75,000 for Bales conversion of the 1963 Chevy Impala SS;

E. GRANT Mann $499,000 in actual damages from Defendants, $300,000 in loss of income from Defendants, AND an additional $75,000 from Bales for the illegal conversion/improper conversion of Mann's 1963 Impala SS for Count 5 Replevin;

F. GRANT Mann $499,000 in actual damages, $300,000 in loss of income, AND $75,000 in damages from Bales alone for the 1963 Chevy Impala -- all of these for the Count 6 Breach of Fiduciary Duty totalling $799,000 for Defendants and an additional $75,000 for Bales;

G. GRANT Mann $499,000 in actual damages, $300,000 in loss of income, AND $75,000 in damages from Bales alone for the 1963 Chevy Impala SS sale totalling $799,000 in total from defendants, and the additional $75,000 from Bales for Count 7 Tortious Interference With A Contract;

H. GRANT Mann $499,000 in actual damages, $300,000 in loss of income, $75,000 for Bales alone for the 1963 Chevy Impala SS, and

$10,000,000.00 for Count 8 Intentional Infliction of Emotional Distress totalling $10,799,000 for Defendants, **AND** an additional $75,000 from Bales for the theft of the 1963 Chevy Impala SS (these punitive damages come from the fact that Mann was treated this way simply because he is a prisoner);

I. GRANT Mann $499,000 in actual damages, $300,000 for loss of wages/income, and $5,000,000 in punitive damages for Count 9 Defamation Claim totalling $5,799,000 for Defendants;

J. GRANT Mann $499,000 in actual damages, $300,000 loss of income, $75,000 from Bales only for the 1963 Chevy Impala SS (EIN & VIN Matching w/ 409) and $5,000,000 in punitive damages for Count 10 Illegal Use of Illinois Statutory Short Form Power Of Attorney For Property For Jack T. Mann;

K. GRANT Mann $499,999 in actual damages, $300,000 loss of income, $75,000 from Bales only for the 1963 Chevy Impala SS, and $5,000,000 in punitive damages for Count 11, Violations of Illinois Uniform Fraudulent Transfer Act;

L. GRANT Mann $499,000 in actual damages, $300,000 loss of income, $75,000 from Bales only for the 1963 Chevy Impala SS, totalling $799,000 from Defendants and an additional $75,000 from Bales for Count 12, Constructive Fraud;

M. GRANT Mann $499,000 in actual damages, $300,000 loss of income, $75,000 from Bales for the 1963 Impala SS, totalling $799,000 from Defendants and an additional $75,000 from Bales for Count 13, Actual Fraud.

N. GRANT Mann $499,000 in actual damages, $300,000 loss of income,

and $1,000,000 in punitive damages under the Count 14 for Breach of Illinois Trade Secrets Act;

O. GRANT Mann $499,000 in actual damages, $300,000 in loss of income, and $1,000,000 in punitive damages for Count 15 Violation of Illinois Consumer Fraud And Deceptive Practices Act for the Defendants conspiring and working together in concert to commit this while Mann was a prisoner, thus deceiving all who could and should know about this transaction;

P. GRANT Mann $499,000 in actual damages, $300,000 loss of income, and an additional $1,000,000 in punitive damages for Count 16 Breach of Telephone Consumer Protection Act;

Q. GRANT Mann $499,000 in actual damages, $300,000 loss of income, and $1,000,000 in punitive damages for the improper and illegal use of the POA stating to a Secretary of State Investigator (Sims) that Mann was 'incapacitated' and that Bales 'needed' the money to pay for food -- while Bales neglected to explain to Secretary of State Investigator Sims that she had just returned from Hawaii;

R. GRANT Mann $499,000 in actual damages, $300,000 in loss of income, and an additional $1,000,000 in punitive damages for the sale of Mann's BOB for a price less than usual and customary to assure that the deal with the GF Mann, GRS or similar agency would occur quickly -- all the while causing Mann great harm;

S. GRANT Mann any such other and further relief as this Court deems just and proper.

Date 7/20/15

[signature]
Jack Mann, 22865-424
FCI Allenwood/PO BOX 2000
White Deer, PA 17887

# CERTIFICATE OF SERVICE
# FOR PRO SE DOCUMENTS

On the 20th day of July, 2015, the undersigned party served the following document or documents (list documents):

CIVIL COMPLAINT AT LAW

on (list names and addresses of parties or attorneys):

Heather Bales : Judson MANN : George F. MANN III : Julia A. MANN : G.F. MANN Agency, Ltd. Global Risk Services, Ltd., BOARD OF Directors of All Corporations

by delivering a copy by (state how you served the document, such as U.S. Mail):

U.S. Mail to M.D. of PA to be served by U.S. MARSHAL SVC.

[signature]

(Signature)

JACK MANN

(Print or Type Name)

Clerk of Courts
M.D. Of Pennsylvania

7/20/15

Re: Jack Mann v. Heather Bales, et al.

Dear Prisoner Correspondent:

Please find one (1) copy of the Complaint At Law using the Diversity Jurisdiction (Title 28 U.S.C. § 1332) jurisdiction.

1. This claim is in excess of $75,000 in values and is between Citizens of different States; and corporations which are domiciled in different states.

Please submit copies of any forms you require from me to have these individuals served as I am indigent.

Regards,

Jack Mann
22865-424
FCI Allenwood
PO BOX 2000
White Deer, PA 17887

EXHIBIT 1

COPY
ORIGINAL ON FILE AT LAW OFFICES
OF GOLDSTINE SKRODZKI RUSSIAN,
NEMEC AND HOFF, LTD.
835 McCLINTOCK DRIVE
BURR RIDGE ILLINOIS 60527
(630) 655-6000

**ILLINOIS STATUTORY SHORT FORM
POWER OF ATTORNEY FOR PROPERTY
FOR JACK T. MANN**

(NOTICE: THE PURPOSE OF THIS POWER OF ATTORNEY IS TO GIVE THE PERSON YOU DESIGNATE (YOUR "AGENT") BROAD POWERS TO HANDLE YOUR PROPERTY, WHICH MAY INCLUDE POWERS TO PLEDGE, SELL OR OTHERWISE DISPOSE OF ANY REAL OR PERSONAL PROPERTY WITHOUT ADVANCE NOTICE TO YOU OR APPROVAL BY YOU. THIS FORM DOES NOT IMPOSE A DUTY ON YOUR AGENT TO EXERCISE GRANTED POWERS; BUT WHEN POWERS ARE EXERCISED, YOUR AGENT WILL HAVE TO USE DUE CARE TO ACT FOR YOUR BENEFIT AND IN ACCORDANCE WITH THIS FORM AND KEEP A RECORD OF RECEIPTS, DISBURSEMENTS AND SIGNIFICANT ACTIONS TAKEN AS AGENT. A COURT CAN TAKE AWAY THE POWERS OF YOUR AGENT IF IT FINDS THE AGENT IS NOT ACTING PROPERLY. YOU MAY NAME SUCCESSOR AGENTS UNDER THIS FORM BUT NOT CO-AGENTS. UNLESS YOU EXPRESSLY LIMIT THE DURATION OF THIS POWER IN THE MANNER PROVIDED BELOW, UNTIL YOU REVOKE THIS POWER OR A COURT ACTING ON YOUR BEHALF TERMINATES IT, YOUR AGENT MAY EXERCISE THE POWERS GIVEN HERE THROUGHOUT YOUR LIFETIME, EVEN AFTER YOU BECOME DISABLED. THE POWERS YOU GIVE YOUR AGENT ARE EXPLAINED MORE FULLY IN SECTION 3-4 OF THE ILLINOIS "STATUTORY SHORT FORM POWER OF ATTORNEY FOR PROPERTY LAW" OF WHICH THIS FORM IS A PART (SEE PAGES 5 AND 6 OF THIS FORM). THAT LAW EXPRESSLY PERMITS THE USE OF ANY DIFFERENT FORM OF POWER OF ATTORNEY YOU MAY DESIRE. IF THERE IS ANYTHING ABOUT THIS FORM THAT YOU DO NOT UNDERSTAND, YOU SHOULD ASK A LAWYER TO EXPLAIN IT TO YOU.)

**POWER OF ATTORNEY,** made this 20th day of April, 2005.

1. I, JACK T. MANN, of 3120 Twilight Avenue, Naperville, Illinois, 60564, do hereby appoint my spouse, HEATHER M. MANN, of 3120 Twilight Avenue, Naperville, Illinois, 60564, as my attorney-in-fact (my "agent") to act for me and in my name (in any way I could act in person) with respect to the following powers, as defined in Section 3-4 of the "Statutory Short Form Power of Attorney for Property Law" (including all amendments), but subject to any limitations on or additions to the specified powers inserted in paragraph 2 or 3 below:

(YOU MUST STRIKE OUT ANY ONE OR MORE OF THE FOLLOWING CATEGORIES OF POWERS YOU DO NOT WANT YOUR AGENT TO HAVE. FAILURE TO STRIKE THE TITLE OF ANY CATEGORY WILL CAUSE THE POWERS DESCRIBED IN THAT CATEGORY TO BE GRANTED TO THE AGENT. TO STRIKE OUT A CATEGORY YOU MUST DRAW A LINE THROUGH THE TITLE OF THAT CATEGORY).

(a) Real estate transactions.
(b) Financial institution transactions.
(c) Stock and bond transactions.
(d) Tangible personal property transactions.
(e) Safe deposit box transactions.
(f) Insurance and annuity transactions.
(g) Retirement plan transactions.
(h) Social Security, employment and military service benefits.
(i) Tax matters.
(j) Claims and litigation.
(k) Commodity and option transactions.
(l) Business operations.
(m) Borrowing transactions.
(n) Estate transactions.
(o) All other property powers and transactions.

(LIMITATIONS ON AND ADDITIONS TO THE AGENT'S POWERS MAY BE INCLUDED IN THIS POWER OF ATTORNEY I THEY ARE SPECIFICALLY DESCRIBED BELOW.)

2. The powers granted above shall not include the following powers or shall be modified or limited in the followin

particulars (here you may include any specific limitations you deem appropriate, such as a prohibition or conditions on the sale of particular stock or real estate or special rules on borrowing by the agent): NONE.

3. In addition to the powers granted above, I grant my agent the power to transfer and assign to the then acting Trustee of the JACK T. MANN 2005 TRUST under agreement dated April 20, 2005 any and all assets in which I may have an interest.

(YOUR AGENT WILL HAVE AUTHORITY TO EMPLOY OTHER PERSONS AS NECESSARY TO ENABLE THE AGENT TO PROPERLY EXERCISE THE POWERS GRANTED IN THIS FORM, BUT YOUR AGENT WILL HAVE TO MAKE ALL DISCRETIONARY DECISIONS. IF YOU WANT TO GIVE YOUR AGENT THE RIGHT TO DELEGATE DISCRETIONARY DECISION-MAKING POWERS TO OTHERS, YOU SHOULD KEEP THE NEXT SENTENCE, OTHERWISE IT SHOULD BE STRUCK OUT.)

4. My agent shall have the right by written instrument to delegate any or all of the foregoing powers involving discretionary decision-making to any person or persons whom my agent may select, but such delegation may be amended or revoked by any agent (including any successor) named by me who is acting under this power of attorney at the time of reference.

(YOUR AGENT WILL BE ENTITLED TO REIMBURSEMENT FOR ALL REASONABLE EXPENSES INCURRED IN ACTING UNDER THIS POWER OF ATTORNEY. STRIKE OUT THE NEXT SENTENCE IF YOU DO NOT WANT YOUR AGENT TO ALSO BE ENTITLED TO REASONABLE COMPENSATION FOR SERVICES AS AGENT.)

5. My agent shall be entitled to reasonable compensation for services rendered as agent under this power of attorney.

(THIS POWER OF ATTORNEY MAY BE AMENDED OR REVOKED BY YOU AT ANY TIME AND IN ANY MANNER. ABSENT AMENDMENT OR REVOCATION, THE AUTHORITY GRANTED IN THIS POWER OF ATTORNEY WILL BECOME EFFECTIVE AT THE TIME THIS POWER IS SIGNED AND WILL CONTINUE UNTIL YOUR DEATH UNLESS A LIMITATION ON THE BEGINNING DATE OR DURATION IS MADE BY COMPLETING EITHER (OR BOTH) OF THE FOLLOWING:)

6. This power of attorney shall become effective at such time as I am unable to manage my estate or financial affairs as determined by my attending physician.

7. This power of attorney shall terminate upon my death, unless previously revoked by me.

(IF YOU WISH TO NAME SUCCESSOR AGENTS, INSERT THE NAME(S) OF SUCH SUCCESSOR(S) IN THE FOLLOWING PARAGRAPH).

8. If any agent named by me shall die, become incompetent, resign or refuse to accept the office of agent, I name the following (each to act alone and successively, in the order named) as successor to such agent:

First Successor: JUDSON H. MANN

Second Successor: WILLARD HAZELTON

For purposes of this paragraph 8, a person shall be considered to be incompetent if and while the person is a minor or an adjudicated incompetent or disabled person or the person is unable to give prompt and intelligent consideration to business matters, as certified by a licensed physician.

(IF YOU WISH TO NAME YOUR AGENT AS GUARDIAN OF YOUR ESTATE, IN THE EVENT A COURT DECIDES THAT ONE SHOULD BE APPOINTED, YOU MAY, BUT ARE NOT REQUIRED TO, DO SO BY RETAINING THE FOLLOWING PARAGRAPH. THE COURT WILL APPOINT YOUR AGENT IF THE COURT FINDS THAT SUCH APPOINTMENT WILL SERVE YOUR BEST INTERESTS AND WELFARE. STRIKE OUT PARAGRAPH 9 IF YOU DO NOT WANT YOUR AGENT TO ACT AS GUARDIAN.)

9. If a guardian of my estate (my property) is to be appointed, I nominate the agent acting under this power of attorney a

such guardian, to serve without bond or security.

10. I am fully informed as to all the contents of this form and understand the full import of this grant of powers to my agent

JACK T. MANN, Principal

(YOU MAY, BUT ARE NOT REQUIRED TO, REQUEST YOUR AGENT AND SUCCESSOR AGENTS TO PROVIDE SPECIMEN SIGNATURES BELOW. IF YOU INCLUDE SPECIMEN SIGNATURES IN THIS POWER OF ATTORNEY, YOU MUST COMPLETE THE CERTIFICATION OPPOSITE THE SIGNATURES OF THE AGENTS.)

Specimen signature of agent.

Heather M. Mann

HEATHER M. MANN

I certify that the signature of my agent is correct.

JACK T. MANN

(THIS POWER OF ATTORNEY WILL NOT BE EFFECTIVE UNLESS IT IS NOTARIZED AND SIGNED BY AT LEAST ONE ADDITIONAL WITNESS, USING THE FORM BELOW)

State of Illinois )
) SS.
County of DuPage )

The undersigned, a notary public in and for the above County and State, certifies that JACK T. MANN, known to me to be the same person whose name is subscribed as principal to the foregoing Power of Attorney, appeared before me and the additional witness in person and acknowledged signing and delivering the instrument as the free and voluntary act of the principal, for the uses and purposes therein set forth, and certified to the correctness of the signature of the agent.

Dated: April 20, 2005

"OFFICIAL SEAL"
ERIC R. WILEN
Notary Public, State of Illinois
My Commission Expires May 05, 2008

Eric R. Wilen

Notary Publi

The undersigned witness certifies that JACK T. MANN, known to me to be the same person whose name is subscribed as principal to the foregoing power of attorney, appeared before me and the notary public and acknowledged signing and delivering the instrument as the free and voluntary act of the principal, for the uses and purposes therein set forth. I believe him to be of sound mind and memory.

Dated: April 20, 2005

Witnes

Jack Mann 22865-424
FCI Allenwood
P.O. Box 2000
White Deer, PA 17887

No Fee Enclosed

RECEIVED
SCRANTON
JUL 27 2015
PER ______ DEPUTY CLERK

LEGAL MAIL

⇨22865-424⇦
Mid Dist Of P
P O Box 114
235 N Washi
Room 423
Scranton, PA
United State

ALLENWOOD FEDERAL CORRECTIONAL INSTITUTION
WHITE DEER, PA 17887-2500
JUL 20 2015
DATE

THE ENCLOSED LETTER WAS PROCESSED THROUGH SPECIAL MAILING PROCEDURES FOR FORWARDING TO YOU. THE LETTER HAS BEEN NEITHER OPENED NOR INSPECTED. IF THE WRITER RAISES A QUESTION OR PROBLEM OVER WHICH THIS FACILITY HAS JURISDICTION, YOU MAY WISH TO RETURN THE MATERIAL FOR FURTHER INFORMATION OR CLARIFICATION. IF THE WRITER ENCLOSES CORRESPONDENCE FOR FORWARDING TO ANOTHER ADDRESSEE, PLEASE RETURN THE ENCLOSURE TO THE ABOVE ADDRESS.

JUL 2